## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **COMPANHIA BRASILEIRA CARBURETO DE CALCIO – CBCC**<br><br>  *Plaintiff,*<br><br>  *v.*<br><br>**APPLIED INDUSTRIAL MATERIALS CORP. et al.,**<br><br>  **Defendants.** | **Civil Action No. 01-00646 (RMC)** |
| **COMPANHIA FERROLIGAS MINAS GERAIS-MINASLIGAS, et al.,**<br><br>  **Plaintiffs,**<br><br>  *v.*<br><br>**APPLIED INDUSTRIAL MATERIALS CORP. et al.,**<br><br>  **Defendants.** | **Civil Action No. 01-02678 (RMC)** |

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO FOREIGN DEFENDANTS ELKEM A.S.'S AND EVONIK DEGUSSA GMBH'S MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Defendants Elkem A.S. and SKW Trostberg A.G., now known as Evonik Degussa GmbH (collectively the "foreign Defendants") assert that this Court lacks personal jurisdiction over them.  Defendants are wrong.  The record illustrates that both foreign Defendants had sufficient control over their wholly owned U.S. subsidiaries (Defendants Elkem Metals and CC Metals & Alloys Inc, which was formerly known as SKW Metals & Alloys, Inc.) to justify the exercise of personal jurisdiction over them.  Further, at least one, and possibly both, of the foreign Defendants directly participated in the conspiracy to defraud the ITC into issuing duties on ferrosilicon imports from, *inter alia*, Brazil. Their motions must therefore be dismissed.

## ARGUMENT

### I.    RELEVANT FACTS

The Complaint alleges numerous facts related to the foreign Defendants, their U.S. subsidiaries, and their involvement in the conspiracy.  *See* Complaint, ¶¶ 6, 7, 9-11, 19-21, 27, 29, 36, 38, 39-41, 48, 55, 60, 63.[1]

In addition, the facts discussed in *Plaintiffs' Memorandum in Opposition to Domestic Defendants' Motions to Dismiss* ("Plaintiffs' Main Brief") show that the U.S. subsidiaries were among those principally involved in the conspiracy.  Plaintiffs now set forth additional facts showing that, in reality, the parent companies exerted significant control over and directed the actions of their domestic subsidiaries, both generally and in connection with the anti-dumping petition.

---

[1] All references to paragraphs in the complaint are to the CBCC complaint.

A.     **SKW Trostberg A.G.**

There are numerous facts tending to show that SKW Trostberg A.G. (referred to herein as "SKW Germany") exercised significant control over and directed the activities of, its U.S. subsidiary, CC Metals & Alloys Inc. ("CC Metals").  For instance, during the relevant time period, CCMetals was a wholly owned subsidiary of SKW Germany.[2] Significantly, Gregory Magness, who had been president of CCMetals in the U.S., said that Charlie Zak (who was the vice president of marketing for CCMetals) told him in 1989 that the price fixing conspiracy had been going on for ten years, dating back to approximately 1979 or 1980, when SKW Germany bought CCMetals.  Magness said that Zak told him that "[W]hen the Germans took it over, that's when it started."[3] Furthermore, SKW Germany used CCMetals as a critical component of the price-fixing conspiracy -- to enable the conspirators to control their inventory and to conceal their price-fixing activities.[4]  In addition, SKW Germany and CCMetals shared several key executives, all of whom were involved in the conspiracy.[5]  The facts also demonstrate

---

[2] Dr. Herbert Knahl, who testified at the criminal trial which resulted in the price fixing conviction,  testified that at the beginning of the conspiracy, CCMetals was 100% owned by SKW Germany.  (Trial Transcript ("Trial Tr."), p. 2108).  (The relevant pages from the criminal transcript cited in this Memorandum are attached hereto as Exhibit 1).

[3] Sworn Statement of Gregory L. Magness ("Magness Stmt."), p. 24 (attached as Exhibit "D" to Plaintiffs' Main Brief).

[4] The conspirators traded excess inventory through CCMetals and either sold that inventory to their competitors or supplied it directly to their competitors' accounts under the competitor's name.  Magness testified that he believed the purpose of going through the extra step of trading through CCMetals was "to conceal it a little bit just to make it a third -- you know, a step where it was the trading company doing it, because they weren't the producer."  (Magness Stmt., pp. 25–26).

[5] Dr. Herbert Knahl had been a member of the management board of SKW Germany since 1979.  He was also the president and chairman of CCMetals in the United States.  (*Id.*, pp. 2107–08).  Mr. Scheffler was vice president of operations of CCMetals in the

that many, if not most, of the key decisions regarding the business activities of CCMetals were made by SKW Germany.[6]  In fact, Dr. Knahl, who was in charge of the finances for all of SKW, testified about the significant control he exerted over the U.S. operations and management.[7]  The facts make it clear that the SKW Metals operations were controlled by SKW Germany.

Plaintiffs served SKW Germany with jurisdictional discovery soon after receiving its motion to dismiss.  On December 7, 2009, SKW Germany responded to each interrogatory (attached hereto as Exhibit 2) by stating a variation of the following:  no one at Evonik had any "knowledge of any instance in which anyone acting on behalf of Trostberg had any role in …".  Plaintiffs believe that it is necessary to test the sufficiency of the inquiry behind these responses and have noticed a deposition pursuant to Federal

---

United States, and was also vice president of operations for the German parent company (in fact, he was based in Germany).  (*Id.*, pp. 2118- 19).

[6] Dr. Knahl testified that several key discussions were held at the corporate head office in Germany, and that SKW Germany was ultimately in control of the subsidiary.  (*Id.*, pp. 2113-14).  Knahl also testified that his job in Germany was to watch the profit and loss statement of the entire company.  In directing the business of CCMetals, Knahl told Charlie Zak that the company could not afford to maintain high inventories and Knahl instructed Zak to "sell as much tonnage as he could in a very depressed market."  (*Id.*, p. 2151).

[7] Dr. Knahl testified,

> SKW Alloys was a problem child, and therefore it was within my responsibility that I would spend -- each month I would attend the management meeting of SKW Alloys in Niagara Falls and the officers of the company, and Mr. Zak was an officer at that time of the company, would be present during the management meeting, therefore I had regular contact with Mr. Zak.

(*Id.*, p. 2170).

Rule of Civil Procedure 30(b)(6) for December 23, 2009.  Plaintiffs request the right to supplement the record with the results of that deposition. [8]

   B. **Elkem A.S.**

   Similarly, Elkem A.S. ("Elkem Norway") exercised significant control over, and directed the activities of, its U.S. subsidiary, Elkem Metals (hereinafter "Elkem USA"). First, the facts show that the companies shared executives, and that executives based in the United States were under the direct supervision of executives in Norway.[9]  The evidence also shows that Elkem Norway was the ultimate decision maker, and that Elkem USA was required to act according to orders received from their superiors at Elkem Norway and to clear all decisions through them.[10]  More importantly, there is testimony

---

[8]Defendant SKW Trostberg AG asserts that it divested itself of its U.S. subsidiary, SKW Metals and Alloys as of December 31, 1992, and thus could not be liable for the acts of that company.  What SKW fails to mention, however, is that SKW merely came under the ownership of SKW Germany's parent company, VIAG, which is a conglomerate in Germany.  (Trial Tr., p. 2108).  In addition, the original ferrosilicon anti-dumping petitions were filed on May 22, 1992 and the subsequent petition against, *inter alia*, products from Brazil was filed on January 12, 1993.  Clearly, then, SKW Germany would have still been in place to participate in discussions of the possibility of these filings, the contents of the filings and to have approved the funding of the proceedings.

[9] Isak Lauvaas was a senior vice president of Elkem Norway.  He reported directly to Vogt Lorentzen, president and CEO of Elkem Norway.  Lauvaas was responsible for overseeing the foundry division based in Pittsburgh.  David Beistel headed that division of Elkem USA and reported directly to Lauvas.  (*Id*., pp. 1318-19, 1322).  Francis King testified that he held the same positions (vice president, secretary, and general counsel) for all four Elkem companies including Elkem Norway and Elkem USA.  (Mar. 27, 1997 deposition of Francis A. King ("King Dep."), pp. 14-15) (attached to Plaintiffs' Main Brief as Exhibit C).  Further, Ragnar Huser, an officer of Elkem Norway, on at least one occasion, approved a U.S. price change.  (King Dep., pp. 33-34).  Mr. King further testified that "…I think at that point in time there might have been six people that reported directly to Norway, including myself." (King Dep. p. 36).

[10] David Beistel testified that he was under enormous pressure from Lauvaas to meet with competitors to try and get them to fix prices.  Beistel was instructed to report all communications on the subject to Ragnar Huser (Marketing manager, based in Norway),

that shows that Elkem Norway put "enormous" pressure on employees of Elkem USA to participate in and carry out the conspiracy.[11]

Elkem Norway was also actively involved in the scheme regarding the anti-dumping petition and had ultimate approval on whether or not to proceed. According to Francis King, that involvement was extensive. The Norwegians participated in the discussions with the domestic producers as to whether to file the ITC petition (King Dep. at pp. 93-94). The final decision as to whether "to participate ultimately [in the anti-dumping petition] would have had to have been approved in Norway," (King Dep. at pp. 92-93) with the principal person involved in the decision being Isak Lauvaas, Senior Vice President of Elkem Norway. (King Dep. at pp. 121-122). Further, prior to filing the anti-dumping petition, a number of U.S. producers met with the Brazilian producers to discuss the possibility of filing the petition. (King Dep. at pp. 96-112). Among those present on behalf of Elkem Norway was Ragnar Huser, the marketing manager for Elkem Norway (King Dep. at pp. 105-106). In fact, Elkem A.S. provided a significant portion of the

---

who would then report to Lauvaas, and to keep in constant contact with Norway. Beistel realized that this activity was illegal and he confronted Lauvaas about it. Lauvaas implied that Elkem Norway would deny any wrongdoing, but that if Beistel was convicted, the company would take care of his family by continuing his salary. (Trial Tr., pp. 1246-1252).

[11] C.E. Boardwine, a vice president at Elkem USA, testified that his superiors at Elkem Norway had instructed him to discuss Elkem's plan to reduce production with Zak (CCMetals) and other competitors, and required him to make regular reports of discussions with competitors to them. (Trial Tr., pp. 239-244). Boardwine also testified that he was under "enormous pressure" from his superiors at Elkem Norway to meet and work with his competitors. (*Id.*, pp. 285-286). Beistel testified that he attended a meeting in Zurich, Switzerland, which was called by his boss (Huser) and Zak's boss at SKW Germany (Dr. Knahl). Zak, Knahl, Huser, Lauvaas and Beistel attended the meeting where floor price was discussed. Lauvaas stated that he had the ultimate authority to make decisions for Elkem (both Norway and USA). (*Id.*, pp. 1073-75, 1083-84).

funds required to prepare the petition and all of the related submissions to the ITC. (King Dep. at 110).

## II.     THE FOREIGN PARENT DEFENDANT COMPANIES DIRECTLY CONTROLLED THEIR WHOLLY OWNED DOMESTIC SUBSIDIARIES

This Court has the power to exercise jurisdiction over foreign parent companies. The court must perform a two-pronged analysis to ascertain whether the foreign Defendants retained a corporate personality distinct from their U.S. subsidiaries. *See Smith v. Washington Sheraton Corp*., 135 F.3d 779, 786 (D.C.Cir.1998). The court must determine whether there is "such unity of interest and ownership that the separate personalities" of parent and subsidiary no longer exist, and whether it would be equitable to allow the court to treat the subsidiaries' wrongful acts as those of the parent companies. *Id.*; *see also Camacho v. 1440 Rhode Island Ave. Corp*., 620 A.2d 242, 249 (D.C.1993).

Courts have applied as many as four tests to assist in determining whether a foreign parent corporation can be held liable for the acts of its subsidiary. *See Material Supply Int'l, Ind. v. Sunmatch Indus. Co.*, 62 F.Supp.2d 13 (D.D.C. 1999). The ultimate concern of all four tests is to determine whether the parent corporation "so dominated the [subsidiary] corporation as to negate its separate personality." *Hart v. Department of Agriculture*, 112 F.3d 1228, 1231 (D.C.Cir. 1997). The control exercised by the parent corporation, however, "need not be exclusive in a hypertechnical or day-to-day sense." *Valley Finance v. United States*, 629 F.2d 162, 172 (D.C.Cir. 1980). Two of the four tests fit the circumstances in this case:  the "agency" test, and the "instrumentality" test. Under both tests, the relevant facts demonstrate that personal jurisdiction over the foreign parent Defendants is appropriate in this matter.

A.      **The Agency Test**

Plaintiffs may show that the U.S. subsidiaries of Elkem Norway and SKW

Germany are their alter-egos by demonstrating that they were merely agents of their

foreign parent corporations.  *See Material Supply*, 62 F.Supp.2d at 21; *First Chicago*

*Int'l. v. United Exchange Co*., 836 F.2d 1375, 1378-79 (D.C.Cir. 1988).  A subsidiary is

deemed to be an agent if its corporate parent's ownership of it is not a  "mere

investment," but instead "an alternative means of transacting business by the parent

corporation."  *Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping Authority*,

475 F.Supp. 711, 718 (D.D.C.1979).The facts here support such a finding.  The U.S.

subsidiaries were not mere investments by their parent companies. All of the operations

of both subsidiaries were completely controlled by their superiors from the foreign

parent.  Indeed, this control extended to the U.S. subsidiaries even as far as being forced

to participate in theprice-fixing conspiracy, the illegality of which was recognized by

employees of the U.S. subsidiaries.  In addition, the decision to participate in, and fund,

the conspiracy to defraud the ITC into imposing the unwarranted duties, which underlies

this litigation, were made by at least one of  the corporate parents, (Elkem Norway),

rather than the U.S. subsidiaries.

B.      **The Instrumentality Test**

The instrumentality test involves a determination that the parent exercises

extensive control over the acts of the subsidiary giving rise to the claim of wrongdoing.

*Material* Supply, 62 F.Supp. 2d at 20.  Here, the facts show thatat least Elkem, rather

than just its U.S. subsidiary, participated in and made the ultimate decision to file the

fraudulent anti-dumping petition which destroyed Plaintiffs' ability to compete in the

U.S. ferrosilicon market.  Under the circumstances,  Elkem cannot validly claim that its

control of its U.S. subsidiary did not proximately cause harm to the Plaintiffs.  *Id.* at 21-

22.

### C.   Equitable Considerations

Once unity of interest and ownership is demonstrated, equity requires piercing the

corporate veil whenever "adherence to the fiction of the separate existence of the

corporation would sanction a fraud or promote injustice."  *Material Supply*, 62 F.Supp.2d

at 21 (citing *Shapiro, Lifschitz v. Hazard*, 24 F.Supp.2d 66, 70 n. 3 (D.D.C.1998)).

Defendants' actions are wrought with fraud and malicious intent.  Their conspiracy was

directed towards Plaintiffs, and Defendants' goal was nothing short of destroying

Plaintiffs' business in the United States and eliminating imported ferrosilicon as a source

of competition.  The foreign Defendants seek to elevate form over function, but they

should not be allowedto use their contrived corporate structure to evade responsibility for

their actions.   Based on the facts discussed above, it is appropriate for, this Court to

"pierce the corporate veil" and hold that the U.S. subsidiaries were either agents or

instrumentalities of their foreign parents.

### III.   THE COURT HAS JURISDICTION OVER ELKEM A.S.BECAUSE IT DIRECTLY PARTICIPATED IN THE CONSPIRACY

Elkem Norway has tried to position itselfas having been sued solely as theparent

of its  U.S. subsidiary.  A simple review of the Complaint (¶ 7) and the facts in the record

illustate that this argument is without merit.   As set forth above, its control of its U.S.

subsidiary is sufficient to confer jurisdiction.  In addition, the activity of Elkem Norway

in connection with the dumping petition is also significant.  It was a direct participant in,

and actually funded, the conspiracy aimed at destroying Plaintiffs' ability to compete in

the U.S.  Therefore, for the same reasons underlying personal jurisdiction for the U.S.

participants in this conspiracy, there is personal jurisdiction in this Court over Elkem

Norway.[12]

## CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that the Motions to

Dismiss filed by the foreign parent companies, Elkem A.S. and Evonik Degussa GmbH,

be denied.

December 15, 2009                                    Respectfully Submitted,


  /s/ Daniel B. Allanoff
Bruce K. Cohen
Daniel B. Allanoff
MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.
1521 Locust Street, 8th Floor
Philadelphia, PA.   19102

Michael R. Lazerwitz
Cleary, Gottlieb, Steen & Hamilton
2000 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-1801

Michael J. Freed
Steven A. Kanner
Robert J. Wozniak
Freed Kanner London & Millen LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015

---

[12] As set forth, *supra*, Plaintiffs believe that SKW Germany similarly participated in these activities. They further believe that the completion of discovery with respect to their activities will produce evidence to support this belief.

Mark Reinhardt
Mark Wendorf
Reinhardt, Wendorf & Blanchfield
E - 1000 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101

*Attorneys for Plaintiffs*