# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ─────────────────────────────── | )  |
| **COMPANHIA BRASILEIRA** | ) |
| **CARBURETO DE CALCIO - CBCC,** | ) |
| *et al.,* | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | )     **Civil Action No. 01-646 (RMC)** |
| | ) |
| | )     **(Consolidated with** |
| **APPLIED INDUSTRIAL** | )     **Civil Action No. 01-2678 (RMC))** |
| **MATERIALS CORP.,** *et al.,* | ) |
| | ) |
| **Defendants.** | ) |
| ─────────────────────────────── | ) |

## MEMORANDUM OPINION

In 1992, certain participants in the U.S. ferrosilicon[1] industry filed an anti-

dumping petition with the International Trade Commission ("ITC"), causing the ITC to impose

import duties on foreign producers of ferrosilicon and in turn causing Plaintiffs, who are foreign

producers, to withdraw from the U.S. market.  Subsequently, the Department of Justice

investigated, charged, and convicted U.S. ferrosilicon producers of price fixing.  Based on the

price fixing convictions, the ITC reviewed its decision to impose duties on foreign producers,

and in 1999, the ITC reversed itself.  In 2001, Plaintiffs brought these consolidated cases against

the following U.S. ferrosilicon producers:  CC Metals & Alloys, Inc. ("CC Metals"); Elkem

---

[1] Ferrosilicon is a material used in making steel.

Metals, Inc. ("Elkem"); and Applied Industrial Materials Corporation ("AIMCOR").[2]  Plaintiffs

allege that CC Metals, Elkem, and AIMCOR (collectively "Defendants") conspired to file

fraudulent antidumping petitions with the ITC in violation of the Sherman Antitrust Act, 15

U.S.C. § 1, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

§ 1962(c) & (d).

Defendants filed a joint memorandum in support of their separate motions to

dismiss.  They argue lack of personal jurisdiction, the statute of limitations, lack of standing, and

failure to state a claim.  As explained below, the motions will be denied.

## I.  FACTS

### A.  Factual Background

In May 1992, AIMCOR, American Alloys Inc., Globe Metallurgical Inc.

("Globe"), and unions representing Elkem and CC Metals employees petitioned the ITC to

impose import tariffs on foreign ferrosilicon for alleged unfair "dumping" of those products at

low prices in the United States.  Compl. [Dkt. 1] ¶ 20;[3] Opp'n [Dkt. 114], Ex. A ("1999 ITC

Decision") at 13.  The ITC was persuaded, and the Department of Commerce imposed duties on

ferrosilicon from various foreign countries in 1993 and on ferrosilicon from Brazil in 1994.  This

allegedly caused Plaintiffs, Brazilian ferrosilicon producers,[4] to withdraw from the U.S. market.

_____

[2] Elkem is the successor of Elkem Metals Company, Inc., and CC Metals is the successor in interest to SKW Metals & Alloys, Inc. ("SKW").  All other defendants named in the Complaint have been dismissed.

[3] Citations to the Complaint are to the Complaint in Civil Action No. 01-646.  The Complaint filed in Civil Action 01-2678 is identical in all material respects.

[4] Plaintiffs are:  Companhia Brasileira Carbureto de Calcio – CBCC ("CBCC"); Companhia Perroligas Minas Gerais – Minasligas; and Cia. De Ferroligas Da Bahia – Ferbasa.

Beginning in 1993, the Department of Justice investigated the domestic silicon products industry for illegal price fixing.  That investigation resulted in a guilty plea and two convictions.  On September 22, 1995, Elkem pleaded guilty to conspiracy to engage in price fixing; on April 18, 1996, American Alloys pleaded guilty to the same charge; and on March 17, 1997 CC Metals' predecessor (SKW) and its senior vice president (Charles Zak) were convicted of the same charge.[5]

As a result of the criminal case, in 1998, Plaintiffs requested that the ITC review its ruling on the antidumping petition.  The ITC did so and in August of 1999 reversed its prior decision.  *See* 1999 ITC Decision.  In 2001, Plaintiffs brought these consolidated cases alleging that the Defendants conspired to file fraudulent antidumping petitions with the ITC, causing the imposition of antidumping duties that harmed Plaintiffs.  The Complaint alleges that Defendants violated section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (Count 1) as well as RICO, 18 U.S.C. § 1962(c) & (d) (Counts II and III).[6]

**B.  Procedural Background**

These consolidated cases were stayed while the 1999 ITC Decision lifting the import tariffs was appealed.  After almost ten years of litigation, the Court of International Trade and the Federal Circuit both affirmed.  *See Elkem Metals Co. v. United States*, No. 99-00627, 2008 WL 4097463 (C.I.T. Sept. 5, 2008) (affirming the ITC's fourth remand determination),

---

[5] Globe was named as an unindicted co-conspirator.  SKW and Mr. Zak's convictions were upheld on appeal.  *See United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83 (2d Cir. 1999).  American Alloys filed a petition for bankruptcy protection in January 2000, and it was not named as a defendant in this action.

[6] *See* Compl., Count I ¶¶ 43-47, Count II ¶¶ 48-59, Count III ¶¶ 60-64.

*aff'd without op.*, No. 2009-1007, 2009 WL 1285837 (Fed. Cir. May 11, 2009).

The cases here then resumed.  In 2010, this Court dismissed the case for lack of personal jurisdiction over the Defendants, holding that the government contacts doctrine barred Plaintiffs from relying on Defendants' participation in the ITC proceedings as a basis for personal jurisdiction.[7]  Plaintiffs appealed to the D.C. Circuit.  The Circuit certified to the D.C. Court of Appeals the question of whether, under District of Columbia law, a petition sent to a federal government agency in the District provides a basis for establishing personal jurisdiction over the petitioner when the plaintiff has alleged that the petitioner fraudulently induced unwarranted government action against the plaintiff.  *Companhia Brasileira Carbureto de Calcio v. Applied Indus. Materials Corp.*, 640 F.3d 369, 373 (D.C. Cir. 2011).  When the D.C. Court of Appeals answered in the affirmative, *see Companhia Brasileira Carbureto de Calcio v. Applied Indus. Materials Corp.*, 35 A.3d 1127 (D.C. 2012), the D.C. Circuit vacated the judgment of this Court with regard to personal jurisdiction and remanded for further proceedings.  *Companhia Brasileira Carbureto de Calcio v. Applied Indus. Materials Corp.*, 464 Fed. Appx. 1, 2012 WL 555650 (D.C. Cir. Feb. 10, 2012).[8]

Hence, jurisdiction returned to this Court.  Elkem and CC Metals immediately moved to dismiss for lack of personal jurisdiction.  The Court denied the motion.  *See* Order

---

[7] Mem. Op. [Dkt. 97] at 11 (citing *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983) (such contacts may not be considered to establish personal jurisdiction, as to do so would impair the right to petition the government for redress of grievances).

[8] The Circuit affirmed, in part, this Court's rejection of the coconspirator theory of jurisdiction based on an alleged conspiracy with The Ferroalloys Association ("TFA"), due to Plaintiffs' failure to plead with particularity the conspiracy and the underlying overt acts by TFA within the forum.  640 F.3d at 372.

[Dkt. 109]; Op. [Dkt. 110].  Now, all remaining Defendants (Elkem, CC Metals and AIMCOR) have moved to dismiss, arguing lack of personal jurisdiction, the statute of limitations, lack of standing, and failure to state a claim.  Dismissal is not warranted.

## II.  LEGAL STANDARD

### A.  Rule 12(b)(1)

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint, or any portion thereof, for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  When reviewing a motion to dismiss for lack of jurisdiction, a court must review the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged.  *Barr v. Clinton*, 370 F. 3d 1196, 1199 (D.C. Cir. 2004).  Nevertheless, "the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the [c]ourt accept plaintiff's legal conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006).

To determine whether it has jurisdiction over the claim, a court may consider materials outside the pleadings.  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005).  No action of the parties can confer subject matter jurisdiction on a federal court because subject matter jurisdiction is both an Article III and a statutory requirement.  *Akinseye v. Dist. of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).  The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists.  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994); *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).

### B.  Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face.  Fed. R. Civ. P. 12(b)(6). A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.*  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face."  *Twombly*, 550 U.S. at 570.

A court must treat the complaint's factual allegations as true, "even if doubtful in fact."  *Twombly*, 550 U.S. at 555.  But a court need not accept as true legal conclusions set forth in a complaint.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice.  *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

## III.  ANALYSIS

### A.  Personal Jurisdiction

Defendants contend that they are not subject to the personal jurisdiction of this Court.  To establish personal jurisdiction, a plaintiff must allege facts evidencing purposeful activity in the district, by which the defendant invoked the benefits and protections of the district's laws.  *See Novak-Canzeri v. HRH Prince Turki Bin Abdul Aziz Al Saud*, 864 F. Supp.

203, 205 (D.D.C. 1994).  The Complaint alleges that AIMCOR, Globe, and the unions conducted

such purposeful activity in the district by filing a fraudulent ITC petition.[9]  Compl. ¶¶ 19-20.

In their prior motion to dismiss, Elkem and CC Metals argued that they had no

contacts with this forum and they were not petitioners before the ITC.  They contended that the

fraudulent ITC petition filed by others could not be used as a basis for exercising jurisdiction

over them.  This Court rejected that argument, holding:

> [T]he Court can exercise personal jurisdiction over Elkem and CC
> Metals.  The Complaint alleges that they conspired with the
> petitioners before the ITC to violate the antitrust and RICO laws
> and that the ITC petitioners had the requisite personal contact with
> the District of Columbia, *i.e.*, the filing of the ITC petition.  Thus,
> coconspirator jurisdiction applies.

Op. [Dkt. 109 at 8].  While Elkem and CC Metals have preserved the issue for appeal, they do

not seek reconsideration here.

This time around, Elkem and CC Metals are joined by AIMCOR, who (together

with American Alloys, Globe, and the unions) was a petitioner before the ITC.  In this iteration,

Defendants argue that the Complaint fails to meet the heightened pleading standard for a

pleading a fraud claim.[10]  Defendants argue that Plaintiffs must allege with particularity that the

ITC petition fraudulently induced unwarranted government action against Plaintiffs.  In order to

sufficiently allege fraud, a plaintiff must allege both fraudulent intent and reasonable reliance.

*Companhia Brasileira*, 35 A.3d at 1134.  Unsupported allegations are usually deemed

---

[9] If the petition were not fraudulent, the filing of the petition would fall under the
government contact exception to personal jurisdiction.

[10] A party alleging fraud must "state with particularity the circumstances constituting [the]
fraud . . . ."  Fed. R. Civ. P. 9(b).

insufficient.  *Id*. at 1135.  Noting that limited jurisdictional discovery was taken in this case,

Defendants assert that Plaintiffs should proffer affidavits or other factual support for their

allegations of fraud against AIMCOR and the other ITC petitioners.

      Under the unique circumstances of this case where the ITC has determined that it

had been defrauded, this Court can rely on the ITC's findings as a basis for exercising personal

jurisdiction.   The ITC explained that its original determination that imports were causing

material injury to the domestic producers was based on the false belief that the U.S. ferrosilicon

market was "competitive and price sensitive."  1999 ITC Decision at 3.  In fact, the three U.S.

ferrosilicon producers who represented a majority of U.S. production (Elkem, SKW, and

American Alloys) were convicted of conspiracy to fix prices from 1989 to 1991.  Because the

period of the price fixing conspiracy encompassed a substantial portion of the time period on

which the ITC based its original determination and because the ITC had the authority to

reconsider a decision obtained by fraud, the ITC undertook the task of reconsideration. *Id*. at 3 &

6-7.

      When the ITC decided to impose antidumping tariffs, the focal point of the

analysis was price.  But the ITC had based its original finding on misrepresentations and

omissions by domestic ferrosilicon producers.  "Domestic producers were criminally convicted

of an offense concerning an issue — the establishment of prices for ferrosilicon — that was a

focal point of the original ITC investigations.  In addition, domestic producers made material

misrepresentations and omission throughout the investigations relating to that key issue."  *Id*. at

8.  The record in the original investigation was "replete with material misrepresentations and

omissions stemming from the criminal price fixing conspiracy."  *Id*. at 12.  Accordingly, the ITC

refused to rely on such misrepresentations and omissions:

> In light of the material misrepresentations and omissions made by
> American Alloys, Elkem, SKW, Globe, and AIMCOR, we have
> determined not to rely on information these firms have submitted.
> Their misrepresentations and omissions concerning competition in
> the marketplace and the establishment of prices were pervasive,
> and were not limited to discrete transactions or periods of time.

*Id*. at 23.  The ITC described the effect of the fraud:  "These actions by the domestic producers seriously undermined the integrity of the ITC's proceedings and compromised the deliberative process, and in a broader sense, constituted an abuse of the unfair trade laws we administer."  *Id*. at 3.  The ITC reversed the imposition of import duties.  "[W]e have determined on reconsideration that the domestic ferrosilicon industry is not materially injured or threatened with material injury by reason of imports from Brazil . . . ."  *Id*. at 41.

AIMCOR sought reversal of the August 1999 ITC Decision, and in 2002 the ITC backed off of its prior finding that AIMCOR knew about the price fixing conspiracy.  Because the record contained some evidence that would support a finding that AIMCOR knew about the price fixing conspiracy and some evidence that would support a finding it did not, the ITC decided that it did not have sufficient evidence to find that AIMCOR was culpable of fraud. AIMCOR's Reply [Dkt. 91], Ex. A (2002 ITC Decision) at 7-8.  The ITC made a similar finding regarding Globe.  *Id*. at 8-10.  Even so, the ITC did not reverse its 1999 Decision.  Noting that AIMCOR was a relatively small producer while Elkem, SKW, and American Alloys together represented a majority of the U.S. production, the ITC refused to reverse its conclusion its original antidumping decision had been based on fraud.  *Id*. at 10-11.

> Consequently, our finding on remand that AIMCOR and Globe did
> not make material misrepresentations or omissions during the
> original Commission investigations does not undercut the findings

the Commission made in its 1999 opinion concerning either the
pervasiveness or the significance of the misrepresentations and
omissions that domestic ferrosilicon producers made during the
original investigations.

. . .

The remand record thus supports the same central conclusion that
the Commission made in 1999: that the vast majority of the
domestic industry significantly impeded the Commission's
investigations by making misstatements and omissions that
affected central issues in the original investigations pertaining to
the relevant conditions of competition in the domestic industry,
pricing of the like product, and factors that affected pricing of the
like product.

*Id.* at 11.  The ITC reaffirmed its 1999 Decision.[11]

The Complaint here alleges that Defendants conspired with one another and the

ITC petitioners (AIMCOR, American Alloys, Globe, and the unions).  In addition, the ITC found

that petitioner American Alloys was culpable of fraud before the ITC in Washington D.C.  That

contact with the District of Columbia serves as a basis for personal jurisdiction over American

Alloys.  When a court has personal jurisdiction over a coconspirator (American Alloys) of a

nonresident defendant (Defendants), the coconspirator is deemed the nonresident's agent for

---

[11] The ITC reaffirmed, holding:

In light of the fact that domestic prices were a function of the conspiracy, demand
trends, and the ferrosilicon production process, we cannot conclude that there is a
significant nexus between the subject imports and any price suppression or
depression experienced by the domestic industry.  In the 1999 opinion, we
concluded that, absent volume or price effects, we could not find that the subject
imports had a significant impact on the domestic industry.  We reaffirm that
conclusion now.

2002 ITC Decision at 27.

purposes of the long arm statute.  *See United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 116, 122 (D.D.C. 2000).  Thus, the ITC petitioners (including American Alloys) are deemed to be the agents of AIMCOR, Elkem, and CC Metals for the purpose of the long arm statute.

To establish personal jurisdiction over coconspirators, a plaintiff must allege with particularity the existence of the conspiracy, the defendant's participation in the conspiracy, and an overt act by a coconspirator within the forum.  *FC Inv. Grp. v. IFX Markets, Ltd*., 529 F.3d 1087, 1096 (D.C. Cir. 2008).  The Complaint alleges Defendants conspired to file a fraudulent antidumping petition with the ITC.  Compl. ¶¶ 16-18.  It alleges an overt act by a coconspirator in the forum — the filing of the allegedly fraudulent antidumping petition with the ITC.  *Id*. ¶¶ 19-20.  It also alleges that AIMCOR, Elkem and CC Metals participated in the conspiracy by asserting that: they agreed to it and coordinated with the ITC petitioners, *id*. ¶¶ 16, 18, 22; they provided false information to the ITC via questionnaires, *id*. ¶ 17, 22-23, 55i, 55m; they induced unions to join the ITC petition, *id*. ¶ 20; and they paid the unions' attorney fees.  *Id*.[12]  The motion to dismiss for lack of personal jurisdiction will be denied.

## B.  Statute of Limitations

Defendants also contend that this suit should be dismissed as barred by the applicable four year statute of limitations applicable to antitrust and RICO actions.  Damages are

---

[12] While the allegation of  "inducement" of the unions to file the ITC petition and payment of the unions' attorney fees did not demonstrate contact with the District of Columbia that *on its own* could be the basis of personal jurisdiction, these allegations suffice to assert that Elkem and CC Metals took certain actions in furtherance of the alleged conspiracy.  Similarly, while the allegation that Elkem and CC Metals provided false responses to ITC questionnaires does not constitute contact with the District that establishes personal jurisdiction over Elkem and CC Metals, these allegations also support a claim that they took action in furtherance of the alleged conspiracy.

recoverable under federal antitrust acts only if suit is commenced within four years after the cause of action accrued. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (citing 15 U.S.C. § 15b); *see Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 183 (1997) (citing *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987) (the four year statute of limitations that applies to antitrust actions also applies to civil RICO claims).

    Generally, an antitrust claim accrues and the statute of limitations begins to run when a defendant commits an overt act that injures a plaintiff's business. *Zenith Radio*, 401 U.S. at 338. Even so, an antitrust suit can be brought more than four years after the events which initially created the cause of action if the damages attributable to the defendant's actions outside the limitation period were speculative or unprovable at that time. *Zenith*, 401 U.S. at 339 (cited with approval in *Klehr*, 521 U.S. at 190-91).[13] The rule focuses on when the injury accrued.

> [I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date. To recover those damages, he must sue within the requisite number of years from the accrual of the action. On the other hand, it is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable.
>
>   *In antitrust and treble-damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered.* In these instances, the cause of action for future damages,

---

[13] A claim can also be brought outside the limitations period under the "continuing violations" theory. Under this theory, if a defendant committed further overt acts that harmed the plaintiff within the limitations period, the plaintiff can recover for the injuries caused by the additional overt acts. *Zenith*, 401 U.S. at 338-39.

> if they ever occur, will accrue only on the date they are suffered;
> thereafter the plaintiff may sue to recover them at any time within
> four years from the date they were inflicted. *Otherwise future
> damages that could not be proved within four years of the conduct
> from which they flowed would be forever incapable of recovery,
> contrary to the congressional purpose that private actions serve as
> an important bulwark of antitrust enforcement, and that the
> antitrust laws fully protect the victims of the forbidden practices as
> well as the public.*

*Zenith*, 401 U.S. at 339-40 (internal quotation marks and citations omitted) (emphasis added).  In

other words, a plaintiff may recover for acts that violate the antitrust laws which were committed

prior to the statute of limitations date, but he may only recover damages for such acts which

accrued and became ascertainable within the period of the statute.  *In re Multidistrict Vehicle Air

Pollution*, 591 F.2d 68, 73 (9th Cir. 1979).  Damages "accrue" when they can be reasonably

established.  *Poster Exchange, Inc. v. Nat'l Screen Serv. Corp.*, 456 F.2d 662, 667 (5th Cir.

1972) (following *Zenith*).  "The moment the victim can prove such subsequent damages, the

statute begins to run leaving four more years in which to assert them."  *Id.*

  Like the antitrust statute, the objective of civil RICO is to encourage civil

litigation to supplement Government efforts to deter and penalize prohibited practices.  *Rotella v.

Wood*, 528 U.S. 549, 557 (2000).  Also, like the antitrust statute of limitations, the statute of

limitations for a RICO claim is based on an injury-focused accrual rule.  *Id.* at 555.  To put it

another way, a RICO cause of action accrues when the plaintiff knew, or should have known, of

the existence of the RICO injury.  *Lares Group, II v. Tobin*, 221 F.3d 41, 44 (1st Cir. 2000)

(citing *Rotella*, 528 U.S. 549).

  Defendants contend that Plaintiffs' causes of action accrued in February 1994

when Plaintiffs were allegedly injured, *i.e.*, when duties were first imposed on Plaintiffs due to

the ITC's antidumping decision.  Defendants further assert that the statute of limitations expired

four years later, in February of 1998, and thus this case (filed in 2001) was out of time.

But under the principles enunciated above, Plaintiffs' antitrust and RICO claims

are not barred by the statute of limitations.  Plaintiffs' antitrust and RICO claims did not accrue

until 1999 because their damages were not actually discoverable and were not provable until the

1999 ITC Decision.  Before 1999 it was not known whether Defendants' actions caused the ITC

to impose the antidumping tariffs (thereby injuring Plaintiffs) or whether the 1999 ITC Decision

had an independent basis.  The filing of this suit in 2001 was well within the four year statute of

limitations period.

In fact, this case was stayed until 2008 in order to permit Defendants to appeal the

1999 ITC Decision to the Court of International Trade and then to the Federal Circuit, with the

understanding by the parties and the Court that Plaintiffs' case hinged on the affirmance of the

1999 ITC Decision.  If the 1999 ITC Decision did not become final, but instead it was

determined that the duties were rightly imposed despite the actions of the ITC petitioners and

Defendants, Plaintiffs would not have been injured by reason of Defendants' actions.

The finding that damages did not accrue until the 1999 ITC Decision is

underscored by a district court decision in a pre-1999 suit similar to this one — *Midland Export,*

*Ltd. v. Elkem Holding, Inc.*, 947 F. Supp. 163 (E.D. Pa. 1996).  In that case, Midland was a

ferroalloy importer who sued Elkem and others alleging that they had "deliberately engaged in

price fixing with the purpose of causing antidumping duties to be imposed on plaintiff" and

alleging that the defendants had violated the Sherman Act.  947 F. Supp. at 164-65.  Defendants

argued that Midland lacked standing to sue because Midland could not prove a causal connection

between the alleged price fixing and its injury.  Defendants argued that their actions did not harm

the plaintiff; it was the ITC's imposition of tariffs that did.  The court agreed and dismissed the

case, noting "Defendants can be said to have 'caused' the ITC's [duties] determination only to

the extent that their alleged price fixing and the information they supplied actually influenced the

ITC's decision."  *Id*. at 167-68.  The *Midland* court explained, "[W]e cannot say that market

distortion resulting from price fixing would likely result in the wrongful imposition of

antidumping duties by the ITC given the ITC's expertise and independent decision process."  *Id*.

at 167.  The ITC considers numerous factors in deciding whether to impose antidumping duties,

some of which are not related to price fixing or market distortion.  *Id*. at 168.  "Thus, determining

the degree to which the ITC actually relied on information unrelated to the alleged conspiracy

would inevitably be a highly speculative inquiry, impossible to resolve with any degree of

certainty."  *Id*.

   In this case, Plaintiffs do not ask the Court to undertake such a "highly

speculative" inquiry.  The ITC itself determined that its imposition of duties on foreign

ferrosilicon was based on misrepresentations and omissions by the ITC petitioners and

Defendants.  Until the ITC review was complete, it was unknown and unknowable whether that

agency would conclude that Defendants' fraud caused the imposition of import duties or whether

the ITC would conclude that the duties were appropriate despite the fraud.  Plaintiffs' claims

accrued when their injury became discoverable, provable, and no longer speculative — *i.e.*, at the

time of the August 1999 ITC Decision when Plaintiffs' cause of action accrued.  To hold

otherwise would allow the defrauding party the benefit of his fraud.

   Defendants complain that to allow this litigation to proceed twenty years after the

price fixing conspiracy ended would undermine the purpose of the statute of limitations.  But it is not Plaintiffs' fault that this case has lingered so long.  While convictions related to the price fixing conspiracy were obtained in 1995 through 1997, it was not until 1999 that the ITC reversed its decision to impose the antidumping tariffs.  That decision was appealed and was affirmed almost ten years later in May 2009.  *See Elkem Metals*, 2008 WL 4097463, *aff'd without op.*, 2009 WL 1285837.  In the meantime, Plaintiffs filed suit here, and the case was stayed awaiting the result of the appeals.  When the Federal Circuit ruled in 2009, this Court lifted the stay, Defendants moved to dismiss, and, in 2010, the Court granted the motion based on personal jurisdiction.  Plaintiffs appealed, and the Circuit did not resolve the appeal for another two years.  While a final resolution to this case would benefit all parties, the simple desire to end a long-standing case does not serve as an adequate reason to find it barred by the statute of limitations.

### C.  Standing

Defendants also contend that Plaintiffs lack antitrust standing to bring this suit. Antitrust standing requires a plaintiff to show an actual or threatened injury "of the type that the antitrust laws were intended to prevent" that was caused by the defendant's alleged wrongdoing. *Andrx Pharm. Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806 (D.C. Cir. 2001).  To satisfy the antitrust standing requirement, a plaintiff must show that its alleged injury has a sufficiently direct causal relationship to the alleged wrongdoing.  *Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 533-35 (1983).  "[W]hen competitors violate the antitrust laws and another competitor is forced from the market, the latter suffers an injury-in-fact."  *Andrx*, 256 F.3d at 806.

Defendants make the same argument that the defendants in *Midland* did — that the ITC caused Plaintiffs' injury, not Defendants.  As explained above, *Midland* was different in one key respect — the ITC had not yet reversed its decision to impose antidumping duties. In *Midland*, it was impossible to tell if the ITC would have imposed antidumping duties, independent of the alleged antitrust wrongdoing.  *See Midland*, 947 F. Supp. at 167-68.  This case arises after the ITC has determined unequivocally that it would not have imposed antidumping duties if it had not been for the misrepresentations and omissions of the petitioners and Defendants.  *See* August 1999 Decision; ITC 2002 Decision.  *Midland* is inapposite due to this critical distinction.

Defendants also argue, without supporting evidence, that Plaintiffs caused their own injury – that "[i]f Plaintiffs had not charged less than fair value for their ferrosilicon, they would have been able to compete in the United States market regardless of whether Defendant's had filed antidumping petitions or not."  This argument ignores the ITC's reversal of the imposition of tariffs and its finding that its original decision was based on the false understanding that the market was competitive and price sensitive.  *See* 1999 ITC Decision at 3.

In addition, Defendants contend that Plaintiffs are not the proper parties to bring suit, that the tariffs were imposed on importer agents and when the duties were reversed the tariffs were returned to the agents.  Plaintiffs do not alleged that they paid the tariffs themselves nor do they seek recoupment of the tariffs.  Instead, they assert their own injury separate from the harm caused to importer agents.  They allege that they suffered an antitrust injury when they were excluded from the market, and they seek to recover lost profits.  Consequently, Plaintiffs are the proper party to seek to recover for the alleged antitrust injury.  They have shown a sufficiently

direct relationship between Defendants' alleged wrongdoing and the imposition of duties that allegedly caused Plaintiffs to be excluded from the market.[14]

Defendants also contest Plaintiffs' standing to bring the RICO claims.  Again, Defendants assert that they did not cause any injury to Plaintiffs — the ITC did.  As explained above, this assertion is meritless.  Plaintiffs allege that Defendants conspired to impose antidumping duties on Plaintiffs and used the ITC as their tool to do so.  The ITC determined that it imposed duties based on the wrongdoing of the ITC petitioners and Defendants.  Plaintiffs have standing to bring the RICO claims.  The motion to dismiss for lack of standing will be denied.

### D.  Failure to State a RICO Claim

Defendants contend that Plaintiffs have failed to allege a "pattern" of RICO activity.  A claim under RICO consists of four elements:  (1) conducting (2) an enterprise (3) through a pattern (4) of racketeering activity.  *W. Assocs. Ltd. P'shp. v. Market Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001); *see* 18 U.S.C. § 1962(c).[15]  "Racketeering activity" requires the commission of specified predicate criminal acts that are defined by statute.  *W. Assocs.*, 235 F.3d at 633.  RICO requires at least two overt acts of racketeering activity in order to establish a pattern.  18 U.S.C. § 1961(5).  Further, these acts must be related and must "amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Nw. Bell Tele. Co.*, 492

---

[14] Defendants also assert a bogus claim that Plaintiffs' suit will result in duplicative recovery because Defendants have already settled certain claims by direct purchasers of ferrosilicon.  Plaintiffs are producers/sellers of ferrosilicon; they seek to recover lost profits; their damage claims are not the same as those of direct purchasers who allegedly over-paid.

[15] It is also a violation of the RICO statute to conspire to violate any subsection of 18 U.S.C. § 1962.  *See* 18 U.S.C. § 1962(d).

U.S. 229, 239 (1989).

In determining whether there is an alleged "pattern" of RICO activity, courts use a commonsense, fact-specific approach. *Id.* at 241-42. The RICO pattern requirement "helps to prevent ordinary business disputes from becoming viable RICO claims." *W. Assocs.*, 235 F.3d at 637. Courts have dismissed cases where the complaint alleges a combination of only a single scheme, a single injury, and a few victims. *See id.* at 635 (dismissing RICO claim where plaintiff alleged a single scheme of fraudulent bookkeeping entries, resulting in the diminished value of a single partnership).

Common sense dictates that the claim alleged here is far from an ordinary business dispute. Plaintiffs assert a large price fixing and antidumping scheme involving 57 predicate offenses in furtherance of a ten-year conspiracy to eliminate foreign competition so that conspirators could maintain prices above what market conditions would ordinarily allow. Compl. ¶ 16-23. Defendants were allegedly engaged in a "massive scheme to manipulate the entire North American market for ferrosilicon and exclude from the market every ferrosilicon producer from numerous countries around the world including China, Russia, Kazakhstan, Ukraine, Venezuela, and Brazil." Pl.'s Opp. [Dkt. 114] at 28. Defendants allegedly injured every ferrosilicon producer in these six countries and affected every purchase of ferrosilicon in the United States during the time of the price fixing conspiracy and the antidumping conspiracy. The motion to dismiss the RICO claims for failure to state a claim will be denied.

## IV.  CONCLUSION

For the reasons stated above, the motions to dismiss filed by Elkem Metals, Inc. [Dkt. 111], by CC Metals & Alloys, Inc. [Dkt. 112], and by Applied Industrial Materials

Corporation [Dkt. 113] will be denied.[16]  A memorializing Order accompanies this Memorandum

Opinion.


Date: August 20, 2012                                    _____/s/_____
                                                         ROSEMARY M. COLLYER
                                                         United States District Judge

---

[16] The Court makes no findings here regarding whether Plaintiffs can garner sufficient evidence to survive a summary judgment motion or to succeed at trial.